IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | Judge Charles M. Walker |
| **AMARILLO PLATINUM, LLC;** ) | |
| **MIDLAND PLATINUM, LLC;** ) | Case No. 3:24-bk-02447 |
| **MIDLAND PLATINUM II, LLC;** ) | Case No. 3:24-bk-02448 |
| ) | Case No. 3:24-bk-02449 |
| Debtors. ) | |
| ) | JOINT ADMIN REQUESTED |

**EXPEDITED MOTION FOR ENTRY OF ORDER
AUTHORIZING INTERIM USE OF CASH COLLATERAL AND
<u>GRANTING FINAL USE OF CASH COLLATERAL ABSENT TIMELY OBJECTION</u>**

The above-captioned debtors (the "Debtors") in the above-captioned bankruptcy cases respectfully submit this *Expedited Motion for Entry of Order Authorizing Interim Use of Cash Collateral and Granting Final Use of Cash Collateral Absent Timely Objection* (the "Motion") pursuant to 11 U.S.C. § 363 and Rules 4001(b) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a) seeking approval and authorization for immediate interim use of cash collateral by each of the Debtors and (b) granting final use of cash collateral by each of the Debtors absent a timely objection thereto. The Debtors support the Motion as follows:

**PRELIMINARY STATEMENT**

As set forth in the Debtors' contemporaneously filed *Consolidated Company Profile* (the "Company Profile"), the Debtors are three limited service hotels operating in Midland and Amarillo, Texas. Each are subject to deeds of trust from 2017 evidencing loans from Community First Bank & Trust ("CFB") ranging from $7 million to $7.5 million and secured on the hotel properties. Following maturity, CFB sold this debt to LBC2 Trust, a debt trust managed by a firm known as Willow River Capital Management, LLC ("Willow River"). This indebtedness is hereinafter referred to as the "Willow River Indebtedness." As further set forth in the Company

Profile, the Debtors filed these cases, in part, due to a pending foreclosure sale of the Debtors' hotel assets by Willow River, which was set for July 2, 2024.

From a review of the documents presently available, the Debtors take the position that the Willow River Indebtedness is not secured by a lien on any of the Debtors' hotel revenues. Thus, Willow River has no lien on the Debtors' cash collateral generated from hotel operations. It therefore is not entitled to adequate protection as a condition of the Debtors' ongoing cash use. The Debtors nonetheless acknowledge that certain other creditors may hold liens on the Debtors' cash collateral and could be entitled to adequate protection. The Debtors further acknowledge that Willow River may dispute the Debtors' conclusions regarding the scope and extent of the liens securing the Willow River Indebtedness. They therefore request that this Court (a) grant interim use of cash collateral on an emergency basis, (b) set a deadline for objections by any secured creditor that may assert an interest in the Debtors' cash collateral and (c) either automatically authorize final use of cash collateral in the absence of any timely objection (as set forth below) via self-effectuating order or set a hearing on further cash use if such timely objection is raised.

## SUMMARY OF RELIEF REQUESTED

1. <u>Expedited Relief Requested</u>. The Debtors request that immediate interim authorization for use of cash collateral be given pursuant to 11 U.S.C. § 363 and Bankruptcy Rule 4001(b)(2) to allow each to use its respective cash on hand and ongoing cash and credit card receipts from hotel operations to fund its ordinary and necessary operating expenses.

2. <u>Basis for Urgency</u>. This matter must be handled on an expedited basis because the Debtors' business operations and reorganization efforts will suffer immediate and irreparable harm absent interim use of cash collateral. Through this Motion, the Debtors seek authority to use cash collateral on an interim basis through July 24, 2024 and on a final basis thereafter in the absence

of any timely objection. Continued use of hotel revenues to fund operating expenses is critical to preserving the going concern value of the Debtors' assets and protecting creditor recovery.

3. <u>Notice</u>. Notice of this Motion has been served by email to (1) the Office of the U.S. Trustee, (2) Lisa C. Fancher of Fritz Byrne, PLLC (lfancher@fritzbyrne.law), counsel for Willow River, and (3) The United States Small Business Administration (covideidlservicing@sba.gov); (4) CT Corporation Systems (lawfirmteam1@wolterskluwer.com; and uccfilingreturn@wolterskluwer.com); and by U.S. Mail, postage prepaid, to the parties on the attached service list in accordance with Fed. R. Bankr. P. 4001(b).

4. <u>Suggested Hearing Date</u>. The Debtors request that the Court set an expedited hearing on this Motion as soon as possible to prevent irreparable harm.

## COMPANY HISTORY AND BACKGROUND

5. On July 1, 2024 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under the Bankruptcy Code. The Debtors each are in possession of their respective property and are managing their business affairs as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. No official committee of unsecured creditors has been appointed in this case, nor is one expected.

6. The Debtors filed the Company Profile contemporaneously with this Motion, which includes a summary of the Debtors' operations and the reasons for the filing of these cases. The contents of the Company Profile are incorporate herein by reference.

## THE DEBTORS' CREDITORS ASSERTING A LIEN ON CASH COLLATERAL

7. The Debtors recognize the requirements of 11 U.S.C. § 363 and that cash accounts exist which may constitute "cash collateral" as that term is defined therein.

8. The Debtors acknowledge the existence of certain deeds of trust of record in the relevant county encumbering the Debtors' respective hotel assets. These include the deeds of trust

evidencing the substantial indebtedness to Willow River on the Willow River Indebtedness (the "Willow River DOTs"). However, hotel revenues are *not* proceeds of real property, which means a creditor cannot attach or perfect a security interest in hotel revenues via a deed of trust, assignment of rents, or other security instrument attaching to real property. Instead, hotel revenues are payment intangibles, and a creditor cannot attach or perfect a lien therein absent (a) a security agreement specifically attaching to such intangible, and (b) a filed UCC-1 financing statement recorded in the county in which the debtor is located describing the attached collateral. *See in re Lexington Hospitality Grp., LLC,* 2017 WL 5035081, at *7-12 (Bankr. E.D. Ky. Nov. 1, 2017).[1]

9. Recognizing that a creditor cannot perfect a lien in payment intangibles absent a recorded UCC-1 financing statement, the Debtors acknowledge that certain creditors have filed UCC-1 financing statements with the Secretary of State for Texas and Tennessee. However, for a creditor to perfect a lien in payment intangibles, such creditor must record a lien with the Secretary of State of the state in which the debtor is "located." Tenn. Code Ann. Tenn. Code Ann. § 47-9-301(1). An entity debtor that is a registered organization under state law is located in its state of organization. *Id.* at § 307(e).

10. Based on its review of the relevant lien documents, the Debtors believe that at least one party may assert an interest in their cash collateral. These parties are hereinafter referred to as the "Cash Collateral Lienholders." The lien review of documents filed with the Texas and Tennessee Secretary of State revealed the following for each debtor:

---

[1] The *Lexington Hospitality* case contains voluminous discussion and analysis as to why (a) hotel revenues are not rents or other proceeds from real property, but rather are payment intangibles due from various credit card processors to the hotel entities, (b) a creditor cannot perfect a lien in a payment intangible—and thus a hotel debtor's post-petition room revenues—absent a security agreement attaching a lien on such collateral and a properly filed UCC-1 financing statement describing such collateral.

4

A. **Amarillo Platinum**

   (i) On June 28, 2020, a UCC-1 financing statement, Document No. 20-0028619068, was filed with the Texas Secretary of State in favor of "U.S. Small Business Administration," asserting a blanket lien on all of Amarillo Platinum's assets.

   (ii) On April 28, 2022, A UCC-1 financing statement, Document No. 22-0024890885 was filed with the Texas Secretary of State in favor of "LBC2 Trust" asserting a lien on Amarillo Platinum's goods and other tangible assets. This UCC-1 financing statement *does not* perfect a lien on Amarillo Platinum's cash collateral in favor of LBC2 Trust.

   (iii) On December 1, 2022, a UCC-1 financing statement, Document No. 22-0058122163, was filed with the Texas Secretary of State in favor of "CT Corporation, as representative," asserting a blanket lien on all of Amarillo Platinum's assets (among other debtors). An identical UCC-1 financing statement, Document No. 437680840, was filed on December 2, 2022 with the Tennessee Secretary of State. The Debtors are unaware of the true identity of such creditor or the basis for such creditor's claim.

B. **Midland Platinum**

   (i) On June 28, 2020, a UCC-1 financing statement, Document No. 20-0029286069, was filed with the Texas Secretary of State in favor of "U.S. Small Business Administration," asserting a blanket lien on all of Midland Platinum's assets.

   (ii) On April 28, 2022, A UCC-1 financing statement, Document No. 22-0024890885 was filed with the Texas Secretary of State in favor of "LBC2 Trust" asserting a blanket lien on Midland Platinum's assets.

   (iii) On December 1, 2022, a UCC-1 financing statement, Document No. 22-0058122163, was filed with the Texas Secretary of State in favor of "CT Corporation, as representative," asserting a blanket lien on all of Midland Platinum's assets (among other debtors). An identical UCC-1 financing statement, Document No. 437680840, was filed on December 2, 2022 with the Tennessee Secretary of State. The Debtors are unaware of the true identity of such creditor or the basis for such creditor's claim.

   (iv) On January 10, 2023, a UCC-1 financing statement, Document No. 23-0001448981, was filed with the Texas Secretary of State in favor of "CT Corporation, as representative," asserting a blanket lien on all of Midland Platinum's assets. The Debtors are unaware of the true identity

of such creditor or the basis for such creditor's claim.

    (v)    On January 23, 2023, a UCC-1 financing statement, Document No. 23-0003110717, was filed with the Texas Secretary of State in favor of "CT Corporation, as representative," asserting a lien on certain specific equipment owned by Midland Platinum. The Debtors are unaware of the true identity of such creditor or the basis for such creditor's claim, but based on this UCC-1 financing statement, such creditor does not have a lien on any of Midland Platinum's cash collateral.

### C. Midland Platinum II

    (i)    On June 28, 2020, a UCC-1 financing statement, Document No. 20-0025064009, was filed with the Texas Secretary of State in favor of "U.S. Small Business Administration," asserting a blanket lien on all of Midland Platinum II's assets.

    (ii)    On April 28, 2022, A UCC-1 financing statement, Document No. 22-0024888347 was filed with the Texas Secretary of State in favor of "LBC2 Trust" asserting a blanket lien on Midland Platinum II's goods and other tangible assets.

    (iii)    On September 28, 2022, a UCC-1 financing statement, Document No. 22-0047765104, was filed with the Texas Secretary of State in favor of "CT Corporation, as representative," asserting a lien on certain specific equipment owned by Midland Platinum II. The Debtors are unaware of the true identity of such creditor or the basis for such creditor's claim, but based on this UCC-1 financing statement, such creditor does not have a lien on any of Midland Platinum II's cash collateral.

    (iv)    On December 1, 2022, a UCC-1 financing statement, Document No. 22-0058122163, was filed with the Texas Secretary of State in favor of "CT Corporation, as representative," asserting a blanket lien on all of Midland Platinum II's assets (among other debtors). An identical UCC-1 financing statement, Document No. 437680840, was filed on December 2, 2022 with the Tennessee Secretary of State. The Debtors are unaware of the true identity of such creditor or the basis for such creditor's claim.

    (v)    On January 10, 2023, a UCC-1 financing statement, Document No. 23-0001449013, was filed with the Texas Secretary of State in favor of "CT Corporation, as representative," asserting a blanket lien on all of Midland Platinum II's assets. The Debtors are unaware of the true identity of such creditor or the basis for such creditor's claim.

11.    The Debtors dispute that any Cash Collateral Lienholder holds an enforceable lien

on any hotel revenue of Amarillo Platinum. First, there is no UCC-1 financing statement recorded with the Secretary of State's office in Tennessee—the state in which Amarillo Platinum is located—other than the disputed lien allegedly held by CT Corporation, as representative for an unknown creditor securing an unknown obligation in an unknown amount against the assets of 14 separate debtors. Neither the SBA nor Willow River (or its predecessor) recorded any UCC-1 financing statement perfecting a lien in Amarillo Platinum's payment intangibles in the proper office. Moreover, even if the Secretary of State's office in Texas were a proper site for recording a UCC-1 financing statement, Willow River did not specifically identify payment intangibles as its collateral. Its UCC-1 financing statement identifies only tangible goods.

12. The Debtors similarly dispute that any Cash Collateral Lienholder holds a lien on any hotel revenue of Midland Platinum or Midland Platinum II other than the United States Small Business Administration (the "SBA") and the disputed lien allegedly held by CT Corporation, as representative. Though Willow River recorded a UCC-1 financing statement allegedly encumbering the payment intangibles of Midland Platinum and Midland Platinum II, Willow River does not have a valid security interest in either such Debtors' cash collateral. This is because no instrument *attaches* such a security interest. The Debtors' representatives will testify that, to their knowledge, no security agreement exists to collateralize the Willow River Indebtedness other than the Willow River DOTs. These instruments do not attach any security interest in any collateral other than the hotel real estate and any fixtures thereto. Thus, Willow River has no lien on any post-petition hotel revenues generated by Midland Platinum or Midland Platinum II.

13. Notwithstanding the foregoing, the Debtors acknowledge that the SBA and CT Corporation, as representative, may hold an enforceable lien against the Debtors' cash collateral and may be entitled to adequate protection. **The Debtors reserve the right to challenge the**

7

Case 3:24-bk-02448    Doc 6    Filed 07/02/24    Entered 07/02/24 10:42:28    Desc Main
Document      Page 7 of 15

**validity or extent of any such liens throughout the pendency of the bankruptcy cases.**

14. To continue operations during this case, as is necessary to maximize the value of the Debtors' assets and preserve the ability to effectively reorganize, the Debtor must continue to use hotel revenues, as well as any revenues generated from non-hotel occupancy sources.

15. Permitting the Debtors to use ongoing hotel revenue, which may constitute cash collateral, will allow the Debtors to (a) avoid disruption of workforce; (b) maintain market presence; (c) maintain continuity of services for customers; and (d) preserve the going concern value of the Debtors' estate while preparing a plan of reorganization and determining efficiencies to increase revenue and reduce expenses.

16. The Debtors propose to adequately protect the Cash Collateral Lienholders through replacement liens on future hotel revenues—including food, beverage, and other revenue not directly associated with hotel room occupancy—as set forth in the budget attached hereto (the "Budgets")[2] and in accordance with 11 U.S.C. § 361(2) to the same extent as their prepetition lien under non-bankruptcy law.

17. The Debtors request that the Court determine that the Cash Collateral Lienholders are adequately protected through the consideration proposed by the Debtors here without the need for any final hearing; provided that this Order shall be without prejudice to any Cash Collateral

---

[2] The Budgets were prepared by Manoj Patel, the Owner and Director of Operations of National Hospitality Consulting Group ("NHCG"). Contemporaneously with this Motion, the Debtors have filed an application to employ NHCG and Mr. Patel as the Debtors' independent restructuring and business advisory firm. Though NHCG believes the Budgets are accurate, they are provided here as an illustration of the Debtors' immediate cash needs based on information reasonably available to NHCG. For the reasons set forth in the Motion, including that the Willow River Indebtedness is not secured by hotel revenues, the Debtors contend that use of cash collateral should not be conditioned upon compliance with the Budgets. The Debtors will report their cash use through required monthly operating reports. To the extent the Court finds otherwise, the Debtors would request reasonable protections be determined at the hearing on this Motion, including but not limited to appropriate bottom line variances from the budgeted revenues and expenses and (b) rolling budgeted but unspent expenses to subsequent periods with variance determinations on a monthly basis consistent with operating reports. The Debtors reserve the right to supplement, modify, update, or replace the Budgets upon the employment of other management professionals that may perform their own cash flow forecast, including but not limited to Banyan Tree Management, LLC d/b/a Aperture Hotels ("Aperture").

Lienholder's right to object to the relief requested herein on or before July 19, 2024. Upon entry of such order in the absence of a timely objection, and upon the Debtors' provision of the adequate protection set forth herein, the Debtors request unrestricted use of their respective cash and future hotel revenues. In the event of a timely objection, the Debtors request a hearing on continued cash use to be set for July 24, 2024.

## BASIS FOR RELIEF

18. Bankruptcy Rule 4001(b) permits a court to approve a request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only … as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See e.g. In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).

19. As previously noted, to continue to operate their businesses and maintain going concern value, the Debtors require the use of ongoing hotel revenue, which may constitute cash collateral. Such use will provide the Debtors with the necessary funds to fully honor all ongoing obligations to employees, vendors and customers and allow the Debtors to proceed toward proposal of a confirmable plan of reorganization.

20. Absent access to the cash collateral, the Debtors would face immediate and irreparable harm that would effect every single stakeholder in this case. Employees would not be paid. Guests would not have available lodging, which would harm the guests themselves and the franchise partners whose intellectual property the Debtors are licensing. The hotels would be liquidated, resulting in a deeply discounted recovery to secured creditors and no recovery to unsecured creditors. Thus, immediate and ongoing access to cash collateral is essential to the

Debtors' continued viability, preservation of going concern value, and ability to successfully reorganize.

21. Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (i) each entity that has an interest in such cash collateral consents, or (ii) the court approves the use of cash collateral after notice and a hearing. 11 U.S.C. § 363(c).

22. Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used … or proposed to be used … by the [debtor in possession], the court … shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Courts typically authorize a debtor to utilize cash collateral to continue operations so long as the interests asserted by affected creditors in such collateral, which equal the value of the collateral rather than of the debt, are adequately protected …" *U.S. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988) (interest in property referenced in § 363(e) refers to the value of the collateral as opposed to the value of the loan). What constitutes adequate protection must be decided on a case-by-case basis.

23. Section 361 of the Bankruptcy Code authorizes a debtor to provide adequate protection by granting replacement liens, making periodic cash payments, or granting such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361. A finding of adequate protection is "left to case-by-case interpretation and development. It is expected that the courts will apply the concept [of adequate protection] in light of the facts of each case and general equitable principles. H.R. Rep. No. 595, 95th Cong., 1st Sess. 339 (1977).

24. The adequate protection provided for in this Motion—replacement liens in hotel revenues, including non-room revenues—is sufficient to adequately protect the Cash Collateral

10

Case 3:24-bk-02448   Doc 6   Filed 07/02/24   Entered 07/02/24 10:42:28   Desc Main
Document    Page 10 of 15

Lienholders' interest in their collateral used by the Debtors, to the extent any Cash Collateral Lienholder has a valid lien therein. As demonstrated by the Budgets, the proposed adequate protection is fair and reasonable and compensates the Cash Collateral Lienholder for any possible diminution in value of the assets securing the lien(s) referenced herein. Given the significant value that the Debtors stand to lose if access to the continued use of cash collateral is denied, such protections are appropriate. Without the use of cash collateral, the business operations will cease, and the Debtors' estate and creditors thereof will be irreparably damaged.

25. To preserve going concern value and avoid immediate and irreparable harm to the Debtors' respective estates, it is imperative that the Debtors be authorized to use cash collateral to continue their operations and to allow the Debtors to administer their cases. Accordingly, the Debtors respectfully requests that the Court grant each Debtor (a) immediate interim use of cash collateral through July 26, 2024 and (b) final use of cash collateral in the event no Cash Collateral Lienholder objects to the relief requested herein on or before July 19, 2024. In the event any Cash Collateral Lienholder timely objects to final use of cash collateral, the Debtors request a hearing to be set on July 24, 2024 at 11:00 a.m.

## WAIVER OF BANKRUPTCY RULES

26. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and provide such other relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

/s/ Henry E. ("Ned") Hildebrand, IV
Henry E. ("Ned") Hildebrand, IV
Gray Waldron
R. Alex Payne
DUNHAM HILDEBRAND PAYNE WALDRON, PLLC
9020 Overlook Boulevard, Suite 316
Brentwood, TN 37027
615.933.5851
ned@dhashville.com
*Counsel for the Debtors*

## CERTIFICATE OF SERVICE

On July 2, 2024, this document was electronically served on all parties consenting to the Court's CM/ECF system and served via regular mail on (i) Debtors' 20 largest unsecured creditors; (ii) all of Debtors' secured creditors; (iii) the Office of the United States Trustee; and (iv) all other parties who have filed a request for written notice.

/s/ Henry E. ("Ned") Hildebrand, IV
Henry E. ("Ned") Hildebrand, IV

**Platinum Owner's Operating Budget**

**PLATINUM COMPANIES**

|  |  | July Weekly | | | | August Weekly | |
|---|---|---|---|---|---|---|---|
|  |  | Week 1 | Week 2 | Week 3 | Week 4 | Week 1 | Week 2 |
|  |  | $ | $ | $ | $ | $ | $ |
| **Armarillo Platinum** | | | | | | | |
| **Summary** | | | | | | | |
| Rooms Available to sell | | 791 | 791 | 791 | 791 | 791 | 791 |
| Rooms Sold | | 738 | 738 | 738 | 738 | 643 | 643 |
| Occupancy % | | 93.41% | 93.41% | 93.41% | 93.41% | 81.38% | 81.38% |
| ADR | $ | 120.46 $ | 120.46 $ | 120.46 $ | 120.46 | $ 119.80 $ | 119.80 |
| RevPar | $ | 112.52 $ | 112.52 $ | 112.52 $ | 112.52 | $ 97.49 $ | 97.49 |
| **Operating Revenue** | | | | | | | |
| Rooms Revenue | 93.90% | $ 96,333 $ | 96,333 $ | 96,333 $ | 96,333 | $ 77,070 $ | 77,070 |
| F & B Revenue | 4.00% | $ 3,853 $ | 3,853 $ | 3,853 $ | 3,853 | $ 3,083 $ | 3,083 |
| Other Operated Departments | 2% | $ 1,734 $ | 1,734 $ | 1,734 $ | 1,734 | $ 1,387 $ | 1,387 |
| Miscellaneous Income | 0.30% | $ 289 $ | 289 $ | 289 $ | 289 | $ 231 $ | 231 |
| **Total Operating Revenue** | 100.00% | $ 102,209 $ | 102,209 $ | 102,209 $ | 102,209 | $ 81,771 $ | 81,771 |
| **Departmental Expenses** | | | | | | | |
| Rooms Expenses | 25% | $ 25,450 $ | 25,450 $ | 25,450 $ | 25,450 | $ 20,361 $ | 20,361 |
| F & B Expenses | 2.00% | $ 2,044 $ | 2,044 $ | 2,044 $ | 2,044 | $ 1,635 $ | 1,635 |
| Other Operated Depts. Expenses | 0.9% | $ 920 $ | 920 $ | 920 $ | 920 | $ 736 $ | 736 |
| Miscellaneous Expenses | 0% | $ 0 $ | 0 $ | 0 $ | 0 | $ 0 $ | 0 |
| **Total Departmental Expenses** | 27.8% | $ 28,414 $ | 28,414 $ | 28,414 $ | 28,414 | $ 22,732 $ | 22,732 |
| **Total Departmental Profit** | 72.20% | $ 73,795 $ | 73,795 $ | 73,795 $ | 73,795 | $ 59,039 $ | 59,039 |
| **Undistributed Operating Expenses** | | | | | | | |
| Administrative & General | 6.20% | $ 6,337 $ | 6,337 $ | 6,337 $ | 6,337 | $ 5,070 $ | 5,070 |
| Information & Telecommunications Systems | 1.50% | $ 1,533 $ | 1,533 $ | 1,533 $ | 1,533 | $ 1,227 $ | 1,227 |
| Sales & Marketing | 2.00% | $ 2,044 $ | 2,044 $ | 2,044 $ | 2,044 | $ 1,635 $ | 1,635 |
| Franchise and Royalties | 8.50% | $ 8,688 $ | 8,688 $ | 8,688 $ | 8,688 | $ 6,951 $ | 6,951 |
| Property Operations & Maintenance | 5.40% | $ 5,519 $ | 5,519 $ | 5,519 $ | 5,519 | $ 4,416 $ | 4,416 |
| Utilities | 3.30% | $ 3,373 $ | 3,373 $ | 3,373 $ | 3,373 | $ 2,698 $ | 2,698 |
| **Total Undistributed Operating Expenses** | 26.90% | $ 27,494 $ | 27,494 $ | 27,494 $ | 27,494 | $ 21,996 $ | 21,996 |
| **Gross Operating Profit** | 45.30% | $ 46,301 $ | 46,301 $ | 46,301 $ | 46,301 | $ 37,042 $ | 37,042 |
| **Management Fees** | 5% | $ 5,110 $ | 5,110 $ | 5,110 $ | 5,110 | $ 4,089 $ | 4,089 |
| **Income Before Non-Oper. Expenses** | 40.30% | $ 41,190 $ | 41,190 $ | 41,190 $ | 41,190 | $ 32,954 $ | 32,954 |
| **Non-Operating Income & Expense** | | | | | | | |
| Property & Other Taxes | 4.90% | $ 5,008 $ | 5,008 $ | 5,008 $ | 5,008 | $ 4,007 $ | 4,007 |
| Insurance | 1.10% | $ 1,124 $ | 1,124 $ | 1,124 $ | 1,124 | $ 899 $ | 899 |
| Other Non Operating Expenses (Atty and Consulting Fees) | 0% | $ 0 $ | 0 $ | 0 $ | 0 | $ 0 $ | 20,000 |
| Cap X Reserve | 4% | $ 4,088 $ | 4,088 $ | 4,088 $ | 4,088 | $ 3,271 $ | 3,271 |
| **Total Non-Operating Income & Expense** | 10.00% | $ 10,221 $ | 10,221 $ | 10,221 $ | 10,221 | $ 8,177 $ | 28,177 |
| **EBITDA** | 30.30% | $ 30,969 $ | 30,969 $ | 30,969 $ | 30,969 | $ 24,777 $ | 4,777 |

**Platinum Owner's Operating Budget**

**Midland Platinum - Hampton Inn**

| | | July Weekly | | | | August Weekly | |
|---|---|---|---|---|---|---|---|
| | | Week 1 $ | Week 2 $ | Week 3 $ | Week 4 $ | Week 1 $ | Week 2 $ |
| **Summary** | | | | | | | |
| Rooms Available to sell | | 612 | 612 | 612 | 612 | 612 | 612 |
| Rooms Sold | | 248 | 248 | 248 | 248 | 304 | 304 |
| Occupancy % | | 41.85% | 41.85% | 41.85% | 41.85% | 51.30% | 51.30% |
| ADR | | $ 135.58 | $ 135.58 | $ 135.58 | 135.58 | $ 144.47 | $ 144.47 |
| RevPar | | $ 56.74 | $ 56.74 | $ 56.74 | 56.74 | $ 74.11 | $ 74.11 |
| **Operating Revenue** | | | | | | | |
| Rooms Revenue | 97.25% | $ 33,581 | $ 33,581 | $ 33,581 | 33,581 | $ 43,863 | $ 43,863 |
| F & B Revenue | 0.00% | $ 0 | $ 0 | $ 0 | 0 | $ 0 | $ 0 |
| Other Operated Departments | 1% | $ 252 | $ 252 | $ 252 | 252 | $ 329 | $ 329 |
| Miscellaneous Income | 2.00% | $ 672 | $ 672 | $ 672 | 672 | $ 877 | $ 877 |
| **Total Operating Revenue** | 100.00% | $ 34,505 | $ 34,505 | $ 34,505 | 34,505 | $ 45,069 | $ 45,069 |
| **Departmental Expenses** | | | | | | | |
| Rooms Expenses | 26% | $ 8,971 | $ 8,971 | $ 8,971 | 8,971 | $ 11,718 | $ 11,718 |
| F & B Expenses | 0.80% | $ 276 | $ 276 | $ 276 | 276 | $ 361 | $ 361 |
| Other Operated Depts. Expenses | 0.6% | $ 207 | $ 207 | $ 207 | 207 | $ 270 | $ 270 |
| Miscellaneous Expenses | 0% | $ 0 | $ 0 | $ 0 | 0 | $ 0 | $ 0 |
| **Total Departmental Expenses** | 27.4% | $ 9,454 | $ 9,454 | $ 9,454 | 9,454 | $ 12,349 | $ 12,349 |
| **Total Departmental Profit** | 72.60% | $ 25,050 | $ 25,050 | $ 25,050 | 25,050 | $ 32,720 | $ 32,720 |
| **Undistributed Operating Expenses** | | | | | | | |
| Administrative & General | 19.16% | $ 6,611 | $ 6,611 | $ 6,611 | 6,611 | $ 8,635 | $ 8,635 |
| Information & Telecommunications Systems | 3.14% | $ 1,083 | $ 1,083 | $ 1,083 | 1,083 | $ 1,415 | $ 1,415 |
| Sales & Marketing | 2.49% | $ 859 | $ 859 | $ 859 | 859 | $ 1,122 | $ 1,122 |
| Franchise and Royalties | 9.57% | $ 3,302 | $ 3,302 | $ 3,302 | 3,302 | $ 4,313 | $ 4,313 |
| Property Operations & Maintenance | 5.74% | $ 6,148 | $ 6,148 | $ 6,148 | 6,148 | $ 6,754 | $ 6,754 |
| Utilities | 4.02% | $ 1,387 | $ 1,387 | $ 1,387 | 1,387 | $ 1,812 | $ 1,812 |
| **Total Undistributed Operating Expenses** | 44.12% | $ 19,390 | $ 19,390 | $ 19,390 | 19,390 | $ 24,052 | $ 24,052 |
| **Gross Operating Profit** | 28.48% | $ 5,660 | $ 5,660 | $ 5,660 | 5,660 | $ 8,669 | $ 8,669 |
| **Management Fees** | 5% | $ 1,725 | $ 1,725 | $ 1,725 | 1,725 | $ 2,253 | $ 2,253 |
| **Income Before Non-Oper. Expenses** | 23.48% | $ 3,935 | $ 3,935 | $ 3,935 | 3,935 | $ 6,415 | $ 6,415 |
| **Non-Operating Income & Expense** | | | | | | | |
| Property & Other Taxes | 2.25% | $ 776 | $ 776 | $ 776 | 776 | $ 1,014 | $ 1,014 |
| Insurance | 1.84% | $ 635 | $ 635 | $ 635 | 635 | $ 829 | $ 829 |
| Other Non Operating Expenses (Atty and Consulting Fees) | 0% | $ 0 | $ 0 | $ 0 | 0 | $ 0 | $ 20,000 |
| Cap X Reserve | 4% | $ 1,380 | $ 1,380 | $ 1,380 | 1,380 | $ 1,803 | $ 1,803 |
| **Total Non-Operating Income & Expense** | 8.09% | $ 2,791 | $ 2,791 | $ 2,791 | 2,791 | $ 3,646 | $ 23,646 |
| **EBITDA** | 15.39% | $ 1,143 | $ 1,143 | $ 1,143 | 1,143 | $ 2,769 | $ (17,231) |

**Platinum Owner's Operating Budget**

|  |  | July Weekly | | | | August Weekly | |
|---|---|---|---|---|---|---|---|
|  |  | Week 1 | Week 2 | Week 3 | Week 4 | Week 1 | Week 2 |
|  |  | $ | $ | $ | $ | $ | $ |
| **Courtyard -Midland II Platinum** | | | | | | | |
| **Summary** | | | | | | | |
| Rooms Available to sell | | 752 | 752 | 752 | 752 | 752 | 752 |
| Rooms Sold | | 419 | 419 | 419 | 419 | 474 | 474 |
| Occupancy % | | 55.75% | 55.75% | 55.75% | 55.75% | 63.10% | 63.10% |
| ADR | | $ 146.17 | $ 146.17 | $ 146.17 | $ 146.17 | $ 168.36 | $ 168.36 |
| RevPar | | $ 81.48 | $ 81.48 | $ 81.48 | $ 81.48 | $ 106.23 | $ 106.23 |
| **Operating Revenue** | | | | | | | |
| Rooms Revenue | 93.20% | $ 61,256 | $ 61,256 | $ 61,256 | $ 61,256 | $ 79,858 | $ 79,858 |
| F & B Revenue | 5.30% | $ 3,247 | $ 3,247 | $ 3,247 | $ 3,247 | $ 4,232 | $ 4,232 |
| Other Operated Departments | 0.65% | $ 398 | $ 398 | $ 398 | $ 398 | $ 519 | $ 519 |
| Miscellaneous Income | 0.85% | $ 521 | $ 521 | $ 521 | $ 521 | $ 679 | $ 679 |
| **Total Operating Revenue** | **100.00%** | $ 65,421 | $ 65,421 | $ 65,421 | $ 65,421 | $ 85,289 | $ 85,289 |
| **Departmental Expenses** | | | | | | | |
| Rooms Expenses | 23% | $ 15,047 | $ 15,047 | $ 15,047 | $ 15,047 | $ 19,616 | $ 19,616 |
| F & B Expenses | 2.00% | $ 1,308 | $ 1,308 | $ 1,308 | $ 1,308 | $ 1,706 | $ 1,706 |
| Other Operated Depts. Expenses | 0.9% | $ 589 | $ 589 | $ 589 | $ 589 | $ 768 | $ 768 |
| Miscellaneous Expenses | 0% | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| **Total Departmental Expenses** | **25.9%** | $ 16,944 | $ 16,944 | $ 16,944 | $ 16,944 | $ 22,090 | $ 22,090 |
| **Total Departmental Profit** | **74.10%** | $ 48,477 | $ 48,477 | $ 48,477 | $ 48,477 | $ 63,199 | $ 63,199 |
| **Undistributed Operating Expenses** | | | | | | | |
| Administrative & General | 7.10% | $ 4,645 | $ 4,645 | $ 4,645 | $ 4,645 | $ 6,056 | $ 6,056 |
| Information & Telecommunications Systems | 1.20% | $ 785 | $ 785 | $ 785 | $ 785 | $ 1,023 | $ 1,023 |
| Sales & Marketing | 2.50% | $ 1,636 | $ 1,636 | $ 1,636 | $ 1,636 | $ 2,132 | $ 2,132 |
| Franchise and Royalties | 9.25% | $ 6,051 | $ 6,051 | $ 6,051 | $ 6,051 | $ 7,889 | $ 7,889 |
| Property Operations & Maintenance | 4.80% | $ 5,973 | $ 5,973 | $ 5,973 | $ 5,973 | $ 6,927 | $ 6,927 |
| Utilities | 3.60% | $ 2,355 | $ 2,355 | $ 2,355 | $ 2,355 | $ 3,070 | $ 3,070 |
| **Total Undistributed Operating Expenses** | **28.45%** | $ 21,445 | $ 21,445 | $ 21,445 | $ 21,445 | $ 27,098 | $ 27,098 |
| **Gross Operating Profit** | **45.65%** | $ 27,032 | $ 27,032 | $ 27,032 | $ 27,032 | $ 36,101 | $ 36,101 |
| **Management Fees** | 5% | $ 3,271 | $ 3,271 | $ 3,271 | $ 3,271 | $ 4,264 | $ 4,264 |
| **Income Before Non-Oper. Expenses** | **40.65%** | $ 23,761 | $ 23,761 | $ 23,761 | $ 23,761 | $ 31,837 | $ 31,837 |
| **Non-Operating Income & Expense** | | | | | | | |
| Property & Other Taxes | 2.00% | $ 1,308 | $ 1,308 | $ 1,308 | $ 1,308 | $ 1,706 | $ 1,706 |
| Insurance | 1.90% | $ 1,243 | $ 1,243 | $ 1,243 | $ 1,243 | $ 1,620 | $ 1,620 |
| Other Non Operating Expenses (Atty and Consulting) | 0% | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 20,000 |
| Cap X Reserve | 4% | $ 2,617 | $ 2,617 | $ 2,617 | $ 2,617 | $ 3,412 | $ 3,412 |
| **Total Non-Operating Income & Expense** | **7.90%** | $ 5,168 | $ 5,168 | $ 5,168 | $ 5,168 | $ 6,738 | $ 26,738 |
| **EBITDA** | **32.75%** | $ 18,592 | $ 18,592 | $ 18,592 | $ 18,592 | $ 25,099 | $ 5,099 |